

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
SOUTHERN DIVISION

|  |  |  |
|---|---|---|
| THE UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 1:14cv430LG-RHW |
| v. | ) | |
| | ) | |
| CITY OF OCEAN SPRINGS, MS, | ) | |
| | ) | |
| Defendant. | ) | Jury Demanded |
| | ) | |

## COMPLAINT

THE UNITED STATES OF AMERICA alleges the following:

## INTRODUCTION

1.     The United States brings this action to enforce Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12131-12134, as amended, and the Department of Justice's implementing regulation, 28 C.F.R. Part 35, against the City of Ocean Springs, Mississippi ("City"), because it violated the ADA and its implementing regulation when it denied Psycamore, LLC ("Psycamore"), an outpatient psychiatric treatment facility, a certificate of occupancy and a use permit based on discriminatory animus towards its patients with mental illness, Psycamore itself, and those associated with them.

2.     The City repeatedly acted inconsistently with its zoning rules and usual practices when it (1) denied Psycamore's application for a certificate of occupancy, (2) required Psycamore to go through the use permit hearing process, and (3) denied Psycamore's application for a use permit.

As a result, the City created a precedent for singling out certain medical facilities that treat patients with mental disabilities and applying a heightened requirement for them to locate in Ocean Springs. The City's actions also perpetuated the stigma surrounding mental health disorders, interfered with Psycamore's ability to treat individuals with mental disabilities in Ocean Springs, and delayed the opening of Psycamore's third clinic (now located in Biloxi, Mississippi) by approximately seven months.

3. Congress found that "discrimination against individuals with disabilities persists in such critical areas as . . . access to public services," 42 U.S.C. § 12101(a)(3), and thus passed the ADA to provide "a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities," 42 U.S.C. § 12101(b)(1).

## JURISDICTION AND VENUE

4. This Court has jurisdiction over this action under Title II of the ADA, 42 U.S.C. § 12133, and 28 U.S.C. §§ 1331 and 1345, because it involves claims arising under federal law.

5. The Court may grant the relief sought in this action pursuant to 28 U.S.C. §§ 2201-2202.

6. Venue is proper in this district pursuant to 28 U.S.C. § 1391 because the City is located, the acts and omissions giving rise to this action occurred, and the property that is the subject of this action is located in this judicial district.

## PARTIES

7. Plaintiff is the United States of America.

8. Defendant City of Ocean Springs, Mississippi, a municipal corporation, including its respective departments, agencies, and other instrumentalities, is a "public entity" within the meaning of 42 U.S.C. § 12131(1) and 28 C.F.R. § 35.104, and is therefore subject to Title II of the ADA, 42 U.S.C. §§ 12131-12134, and its implementing regulation, 28 C.F.R. Part 35.

# FACTS

A.   Ocean Springs' Zoning Process

9.   The City's zoning and land use activities are carried out by its Planning Department, Planning Commission, Mayor, and Board of Aldermen.

10.   Its Comprehensive Zoning Ordinance ("Zoning Ordinance") governs the zoning process and divides the City into thirteen zoning districts, listing the permissible uses of property within the corresponding geographic zoning districts.  Ocean Springs, Miss., Zoning Ordinance §§ 301, 401-412 (2007).

11.   Of the thirteen zoning districts, the following four districts govern commercial establishments: (1) C-1 neighborhood commercial; (2) C-2 community commercial (central business district); (3) C-3 highway commercial; and (4) C-4 commercial limited (which includes hospital-related businesses).  Ocean Springs, Miss., Zoning Ordinance §§ 406-409 (2007).

12.   Commercial zoning is inclusive in Ocean Springs, so all uses allowed within the C-1 and C-2 districts are permitted within the C-3 highway commercial district.  *See* Ocean Springs, Miss., Zoning Ordinance §§ 407.2(1), 408.2(1) (2007).  The C-3 highway commercial district thus permits "[m]edical or paramedical practice or clinics licensed by the State of Mississippi for human care."  Ocean Springs, Miss., Zoning Ordinance § 406.2(9)(a) (2007); *see also* Ocean Springs, Miss., Zoning Ordinance § 202 (defining "[m]edical or paramedical offices" as "[a] facility for the examination and treatment of human patients").

13.   Any entity seeking to change the use of an existing building in the City must obtain either a certificate of occupancy ("CO") or a use permit prior to starting the new use.  *See* Ocean Springs, Miss., Zoning Ordinance § 901.2 (2007).

14.    When the proposed use conforms to the uses listed for the applicable zoning district, the Zoning Ordinance requires the City's Planning Department to issue a CO.  No hearing or vote from the Planning Commission or Board of Aldermen is required to obtain a CO for a legally conforming use. *See* Ocean Springs, Miss., Zoning Ordinance § 901.2(1) (2007).

15.    If the proposed use does not conform to the uses listed, the entity must obtain a use permit, which requires public notice and one or more hearings before City officials.  Before such a use is allowed, the Planning Commission must determine that the proposed use "is similar to or not in conflict with" the permitted uses.  Ocean Springs, Miss., Zoning Ordinance § 408.3 (2007).

16.    If the Planning Commission determines that the proposed use is permitted, the Mayor and Board of Aldermen must then approve the Planning Commission's recommendation before a use permit is issued.  Ocean Springs, Miss., Zoning Ordinance § 408.3 (2007).

B.    Psycamore

17.    Psycamore is a private, mental health service provider for people with serious mental disorders and psychosocial impairments.

18.    Psycamore has offices in Flowood, Southaven, and Biloxi, Mississippi.

19.    It treats people with major psychiatric disorders through intensive outpatient therapy programs with day and evening appointments for no more than ten patients at a time.

20.    Psycamore is licensed by the State of Mississippi Department of Mental Health ("MDMH") as an "acute partial hospitalization" program.  The MDMH defines "acute partial hospitalization" as a program that provides medical supervision, nursing services, structured therapeutic activities, and intensive psychotherapy (individual, family, and/or group) to

4

individuals who are experiencing a period of such acute distress that their ability to cope with normal life circumstances is severely impaired.

21.     To be eligible for services, patients must have a psychiatric illness severe enough to interfere with daily function, but not to require hospitalization.

22.     In 2011, when it applied for a CO and use permit from the City, approximately eighty percent of Psycamore's clients had depression as a primary diagnosis; others had anxiety, panic disorder, post-traumatic stress disorder, obsessive-compulsive disorder, and adjustment disorders.  These mental impairments interfere with brain function, a major bodily function, and with patients' ability to perform various tasks of daily living.

23.     Psycamore's patients thus have mental impairments that substantially limit one or more major life activities, including brain function.

        C.     1101 Iberville Drive

24.     In August 2011, Psycamore leased 1101 Iberville Drive in Ocean Springs ("Property") to open an outpatient psychiatric treatment facility.

25.     Iberville Drive is designated as part of the Marble Springs Historic District and features several businesses, as well as the Marble Springs Historic Park ("Park") and homes.

26.     Since 1984, the Property has been zoned C-3 highway commercial.  It is near the Park, a law firm, a church, a psychologist's office, and a real estate office.  Within a block are two bigger thoroughfares, several bars, a tattoo parlor, a fast food restaurant, and a gas station.

27.     The neighborhood to the east, beyond the Park, is zoned R-1 residential.  The closest residential homes are across the street and across the parking lot for the Park.

28.     Prior uses of the Property include an attorney's office and an insurance company.  The Property is currently being used as law offices.

D.     Certificate of Occupancy Application

29.     At the end of August 2011, Psycamore posted a sign and ran advertisements about its proposed psychiatric treatment facility.

30.     On August 30, Psycamore submitted an application to obtain a CO.  The application identifies "Psychiatric Partial Hospitalization" as the intended use operating Monday through Friday, and notes that this is a day adult program with no session later than eight p.m.

31.     An advocacy group called "Friends of Iberville Drive" ("FID") was formed and hired an attorney to prevent Psycamore from opening.  FID circulated a flier publically and to City officials that depicted Psycamore as the psychiatric ward in the film *One Flew Over the Cuckoo's Nest.*

32.     Local residents also contacted the Mayor, Planning Commission, and Board of Aldermen regarding public safety and the alleged threat posed by Psycamore's patients due to their mental disabilities.

E.     Special Call Meeting and Board of Aldermen Motion

33.     On September 6, 2011, the Board of Aldermen held a "Special Call" meeting to hear public comments on Psycamore's CO application.  Many of the comments focused on an alleged threat to property values and public safety posed by Psycamore's patients due to their actual or perceived mental impairments.  Because of the concerns raised in the comments, by motion, the Board of Aldermen instructed the Planning Department to research whether Psycamore's proposed use was allowed in the C-3 highway commercial district and present its determination to the Planning Commission for review.

34.     The Board of Aldermen's motion further instructed the Planning Department not to make a decision as to whether Psycamore's proposed use was allowed by right in the C-3 highway

commercial district, and instead instructed the Planning Department only to make a recommendation to the Planning Commission and Board of Aldermen.

35.     The Planning Department objected to this motion stating that this was not the process for CO applications—that the process was for the Planning Department to determine whether the use was allowed by right and, if so, then issue a CO.

36.     The Board of Aldermen passed the motion over the objection. Accordingly, the Planning Department researched Psycamore's use and issued a report ("Report") and recommendation to the Planning Commission and Board of Aldermen.

     F.     Report Finding Psycamore's Use Is Permitted and Posed No Threat

37.     The Report recommended that the Planning Commission find Psycamore's use permitted by right because it was a "medical or paramedical clinic." Consequently, according to the Zoning Ordinance sections 408 and 901.2, a CO should have been issued to Psycamore for a conforming use without requiring a public hearing.

38.     The Report found that, in the alternative, "Psycamore's requested use is similar to and not in conflict with those uses specifically allowed in C-3 Highway Commercial."

39.     In support of its recommendation, the Report found that the City has allowed many different types of medical offices and clinics to operate in the City's C-3 highway commercial district without obtaining a use permit. According to the Report, there were approximately 30 medical clinics and surgery centers located in Ocean Springs in C-3 highway commercial and more restrictive zoning districts at the time, and none of these businesses were required to obtain a use permit prior to opening.

40.     The Report further concluded that the Planning Department could find "no research to suggest that a psychiatric office or clinic of the proposed size and nature would have detrimental impacts on property values or public safety."

41.     The Report was presented to the Planning Commission and Board of Aldermen at public hearings on October 25 and November 1, 2011.

G.     Additional Public Hearing on Psycamore's Certificate of Occupancy Application

42.     Prior to the Planning Department issuing its Report and recommendation with respect to Psycamore, the Planning Commission met on September 13, 2011 to determine whether Psycamore's use conformed to uses in the C-3 highway commercial district.

43.     During this meeting, the Planning Director explained to the Planning Commission that the City was not following its usual zoning rules or practices for evaluation of a CO application and that the Board of Aldermen had ordered the Planning Department and Planning Commission to give Psycamore's application greater scrutiny after the Board of Aldermen heard a presentation from the residents of Iberville Drive.

44.     The Planning Director further explained that normally he would make the determination whether this was a legally conforming use in the zoning district and, if so, grant the CO.  Only if the Planning Department determined that it was not permitted by right in the C-3 highway commercial district would Psycamore be required to apply for a use permit and go through the public hearing process.

45.     The Planning Commission also heard presentations by proponents and opponents of Psycamore at this meeting.  The comments of the opponents again focused on an alleged threat to public safety posed by Psycamore's patients due to their actual or perceived mental impairments.

8

46.     The Commission ultimately did not vote on Psycamore's CO application at this meeting.

H.     Use Permit Application

47.     Although Psycamore's proposed use—a "medical or paramedical clinic"—was permitted by right in the C-3 highway commercial district, the City Attorney, by letter to counsel for Psycamore dated September 19, 2011, required Psycamore to apply for a use permit.

48.     On September 22, 2011, Psycamore, under protest, applied for a use permit.  This application was followed by a letter from Psycamore's counsel to the City Attorney, dated September 23, 2011, protesting the City's decision to subject Psycamore to the use permit and public hearing process and stating that Psycamore's use permit application is filed "under protest without an admission that it is appropriate to do so."  The letter underscores that the City was acting in contravention of the City's own zoning rules and past practices, and requests that the City rescind its decision and issue a CO to Psycamore "as [it] would to any other medical business in C-3."

I.     Additional Public Hearings

49.     Thereafter, the Planning Commission and Board of Aldermen held three public hearings regarding Psycamore's use permit application.  During these public hearings, much of the testimony focused on the alleged threat to property values and public safety posed by Psycamore's patients due to their actual or perceived mental impairments.

50.     Prior to an October 25, 2011 Planning Commission hearing, FID submitted a Brief to the City raising concerns of alleged dangers of people with mental health disorders and concluding that Psycamore's "patient population . . . endanger[s] the residents of the surrounding R-1 single family neighborhood."

51.    At the conclusion of the October 25 hearing, the Planning Commission members voted twice—once on a motion to deny Psycamore's use permit and once on a motion to approve it; both votes resulted in a 3-3 tie, with the Planning Commission Chair abstaining.

52.    As a result of the tie votes, the Planning Commission did not make a recommendation to the Board of Aldermen or make any amendments to the Planning Department's Report before forwarding it to the Mayor and Board of Aldermen.

53.    The Board of Aldermen subsequently held another public hearing on Psycamore's use permit on November 1, 2011.  Following Psycamore's presentation, the FID again made a presentation and raised many concerns about Psycamore that were not pertinent to the zoning issue.

54.    At the conclusion of the November 1, 2011 public hearing, the Board of Aldermen voted to take the matter under advisement.  Later that day, in response to an email from a concerned citizen, Mayor Moran wrote: "I do not expect the board [of aldermen] to allow the clinic.  Too much political pressure from wealthy influential citizens."  And in a subsequent newspaper article, the Mayor was quoted as saying that the Board of Aldermen was reluctant "to issue a [use] permit because of the grave objections of the residents."

55.    In a newspaper article published on November 27, 2011, Alderman Matt McDonnell reportedly admitted that, according to the Zoning Ordinance, Psycamore should be allowed to open on Iberville Drive, but stated that it nevertheless did not belong there.

J.    The City's Discriminatory Decision to Deny Psycamore a Use Permit

56.    The Board of Aldermen held a "Special Call" meeting on November 29, 2011, to further discuss Psycamore's use permit application.

57.   At this meeting, the Board of Aldermen began by immediately going into a closed Executive Session "regarding potential litigation appealing a decision" by the Board of Aldermen on Psycamore's use permit application.

58.   Immediately upon returning to regular session, Alderman John Gill presented a "statement" before submitting the matter to a vote.  In this statement, he described Psycamore as operating "like a small factory," while acknowledging that Psycamore only intended "to have eight to ten clients in capacity at any given time."  Much of the statement focused on alleged traffic concerns, as well as the residential and historic nature of the area, and the substandard infrastructure on the street.

59.   Alderman Gill expressly adopted the reasoning and arguments that the FID had set forth in its Brief, including those sections of the FID Brief that focused on the threat of violence, crime, and substance abuse posed by Psycamore's patients due to mental illness—but simultaneously stated that he was "not adopting any arguments regarding violent crime therein." Then, based on the arguments in the Brief and those that he had just set forth in his "statement," he moved to deny Psycamore's use permit application.

60.   Following this motion, although Psycamore's proposed use was permitted by right in the applicable zone and, therefore, clearly met the standard for a use permit, the Board voted 5 to 1 to deny Psycamore's application for a use permit.

61.   As a result of the City's actions, Psycamore had to break its lease, find another location for its treatment facility, and incur out-of-pocket expenses and lost profits.  The City's actions effectively denied Psycamore the opportunity to treat individuals with mental disabilities in Ocean Springs.  The City prevented Psycamore from opening a clinic at the Property and instead Psycamore opened its third clinic in Biloxi, Mississippi, in April 2012.

K.      Finding by the United States

62.    On August 15, 2014, pursuant to 28 C.F.R. Part 35, Subpart F, the Department issued a letter of findings of fact and conclusions of law, and of the minimum steps that the City must take to comply with Title II of the ADA and remedy past violations.

## TITLE II OF THE AMERICANS WITH DISABILITIES ACT

63.    Title II of the ADA prohibits disability-based discrimination in all programs, services, and activities of a local government entity, including zoning and land use decisions, and prescribes that a local government entity: (1) may not provide different or separate aids, benefits, or services to individuals with disabilities; (2) may not limit individuals with disabilities in the enjoyment of any right, privilege, advantage, or opportunity enjoyed by others; (3) may not utilize criteria or methods of administration that have the effect of discriminating against individuals with disabilities; and (4) is required to make reasonable modifications to its policies, practices, or procedures when necessary to avoid discrimination on the basis of disability.  *See* 42 U.S.C. § 12132; 28 C.F.R. § 35.130.

64.    Title II further mandates that a local government cannot exclude or deny equal services, programs, or activities to an individual or entity because of the known disability of an individual with whom the individual or entity is known to have a relationship or association, encompassing "entities that provide services to or are otherwise associated with" individuals with disabilities. *See* 28 C.F.R. § 35.130(g); 28 C.F.R., pt. 35, App. A.  "This provision was intended to ensure that entities such as health care providers . . . and others who provide professional services to persons with disabilities are not subjected to discrimination because of their professional association with persons with disabilities."  28 C.F.R., pt. 35, App. A.

## VIOLATION OF TITLE II OF THE AMERICANS WITH DISABILITIES ACT
### (42 U.S.C. §§ 12131-12134)

65.     The allegations of Paragraphs 1 through 64 of this Complaint are incorporated by

reference.

66.     The persons with mental illness treated by, and associated with, Psycamore are persons

with disabilities, or are regarded as persons with disabilities, within the meaning of the ADA, 42

U.S.C. § 12102 and 28 C.F.R. § 35.104.  They and Psycamore are qualified to receive services

and participate in programs or activities provided by the City.  *See* 42 U.S.C. § 12131(2).

67.     Psycamore alleged disability discrimination by the City in violation of Title II of the

ADA and thus is provided the remedies, procedures, and rights of Title II of the ADA.  *See* 42

U.S.C. § 12133.

68.     In addition, Psycamore and others associated with Psycamore and its patients are

protected under the ADA from disability discrimination because they are associated with

individuals with disabilities.  *See* 28 C.F.R. § 35.130(g).  Psycamore provides professional

healthcare services to people with disabilities.

69.     Defendant's actions constitute discrimination in violation of Title II of the ADA, 42

U.S.C. § 12132, and its implementing regulation, 28 C.F.R. Part 35, by:

    a.          Denying equal services and programs to Psycamore because of the actual

        or perceived mental impairments of its patients, with whom Psycamore has a known

        relationship or association.  *See* 42 U.S.C. § 12132; 28 C.F.R. § 35.130(g);

    b.          Providing different benefits or services to Psycamore and limiting

        Psycamore in enjoyment of any right, privilege, advantage, or opportunity enjoyed by

        others in the City, because of the actual or perceived mental impairments of its

        patients.  *See* 42 U.S.C. § 12132; 28 C.F.R. § 35.130(b)(1);

13

c.  Utilizing methods of administering its programs and services that had the effect of subjecting Psycamore and its patients to discrimination on the basis of disability. *See* 42 U.S.C. § 12132; 28 C.F.R. § 35.130(b)(3); and

d.  Failing to make any necessary reasonable modifications to its policies, practices, or procedures to avoid discrimination against Psycamore on the basis of disability. *See* 42 U.S.C. § 12132; 28 C.F.R. § 35.130(b)(7).

70.  Psycamore and any other persons aggrieved by the City's discriminatory actions are entitled to relief under Title II of the ADA. *See* 42 U.S.C. § 12133; *see also* 29 U.S.C. § 794a (the remedies, procedures, and rights of which are incorporated into Title II by reference); 42 U.S.C. §§ 2000d-2, 2000e-5 (incorporated into 29 U.S.C. § 794a by reference).

## PRAYER FOR RELIEF

WHEREFORE, the United States of America prays that the Court:

A.  Grant judgment in favor of the United States and declare that the City's actions violate Title II of the ADA, 42 U.S.C. §§ 12131-12134, and the Department of Justice's implementing regulation, 28 C.F.R. Part 35;

B.  Enjoin the City, along with its respective departments, agencies, and other instrumentalities, and all others in concert or participation with them, from engaging in discriminatory policies and practices against individuals with disabilities, entities that serve individuals with disabilities, and individuals and entities associated with them, and specifically from:

1.  denying equal services, programs, and activities to individuals with disabilities and individuals and entities associated with them;

2.      providing different benefits or services to individuals with disabilities and individuals and entities associated with them;

3.      limiting individuals with disabilities, and individuals and entities associated with them, in enjoyment of any right, privilege, advantage, or opportunity enjoyed by others; and

4.      utilizing methods of administering its programs and services that have the effect of subjecting individuals with disabilities, and individuals and entities associated with them, to discrimination on the basis of disability;

C.      Issue a declaratory judgment declaring that the City has violated Title II of the ADA by:

1.      denying equal services and programs to Psycamore because of the actual and perceived mental impairments of its patients, with whom Psycamore has a known relationship or association;

2.      providing different benefits or services to Psycamore and limiting Psycamore in enjoyment of any right, privilege, advantage, or opportunity enjoyed by others in the City, because of the actual or perceived mental impairments of its patients; and

3.      utilizing methods of administering its programs and services that had the effect of subjecting Psycamore and its patients to discrimination on the basis of disability;

D.      Order the City to comply with the requirements of Title II of the ADA, 42 U.S.C. §§ 12131-12134, and the Department of Justice's implementing regulation, 28 C.F.R. Part 35;

E.      Order the City to grant Psycamore a CO and use permit, if necessary, to operate an acute partial hospitalization program, or other psychiatric treatment facility, in any C-3 or C-4 zoned district in the City, as those zones are currently defined in the Zoning Ordinance,

15

including the Property, should Psycamore choose to open in these districts in the City at any time in the future;

F.    Enjoin the City from applying any changes to the present or future zoning ordinance that would exclude Psycamore from operating an acute partial hospitalization program or other psychiatric treatment facility in a C-3 or C-4 zone in the City;

G.    Order the City to hire, name or appoint a fulltime ADA Coordinator to assist the City in complying with Title II of the ADA and its implementing regulation;

H.    Order the City to adopt a non-discrimination policy stating that the City will not engage in any act or practice, directly or through contracting, licensing, or other arrangements, that has the purpose or effect of unlawfully discriminating against any person with a disability, or any person or entity associated with them, in violation of Title II of the ADA, or otherwise discriminate on the basis of disability in violation of the ADA;

I.    Order the City to train all its staff, volunteers, administrators, and officials involved in zoning—including the Planning Department, Planning Commission, Board of Aldermen, and Mayor—on the requirements of the ADA, its implementing regulation, and the rights of individuals with disabilities, including the affirmative obligation of public entities to provide equal services, programs, and activities to entities that serve individuals with disabilities, and to ensure that the City's zoning decisions do not discriminate against individuals with disabilities and entities associated with them;

J.    Order the City to make written findings regarding any land use request involving persons with disabilities or any entity related to them that the City receives, denies, or grants with conditions for the next five years; and require that such findings specify the basis for the

16

denial or the conditions imposed and be provided to the United States at the same time as they are sent to the land use applicant;

K.     Order the City to take other affirmative action to prevent discrimination based on disability by the City;

L.     Award compensatory damages, including damages for out-of-pocket expenses and lost profits, to Psycamore and other aggrieved persons in an appropriate amount for injuries suffered as a result of the City's failure to comply with the requirements of Title II of the ADA, 42 U.S.C. §§ 12131-12134, and its implementing regulation, 28 C.F.R. Part 35; and

M.     Order such other appropriate relief as the interests of justice may require.

DATED:  November 24, 2014

Respectfully submitted,

ERIC H. HOLDER, JR.
Attorney General of the United States

VANITA GUPTA
Acting Assistant Attorney General
Civil Rights Division

GREGORY K. DAVIS
United States Attorney
Southern District of Mississippi

EVE L. HILL
Deputy Assistant Attorney General
Civil Rights Division

REBECCA B. BOND
Chief
Disability Rights Section
Civil Rights Division

MITZI DEASE PAIGE, MSB 6014
Chief, Civil Division
Assistant United States Attorney
Southern District of Mississippi
501 E. Court Street, Suite 4.430
Jackson, MS  39201
Telephone:  (601) 973-2840
Facsimile:  (601) 965-4409
Mitzi.Paige@usdoj.gov

SHEILA M. FORAN
Special Legal Counsel
KEVIN J. KIJEWSKI
Deputy Chief
MEGAN E. SCHULLER
Trial Attorney
FELICIA L. SADLER
Trial Attorney
Disability Rights Section
Civil Rights Division
U.S. Department of Justice
950 Pennsylvania Avenue, N.W. – NYA
Washington, D.C.  20530
Telephone:  (202) 307-0663
Facsimile:  (202) 305-9775
Megan.Schuller@usdoj.gov
Felicia.Sadler@usdoj.gov

18